# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 21-805V

|  |  |
|---|---|
| HALEY FARO, <br><br>        Petitioner, <br> v. <br><br> SECRETARY OF HEALTH AND HUMAN SERVICES, <br><br>        Respondent. | Chief Special Master Corcoran <br><br><br> Filed: February 2, 2026 |

*Matthew F. Belanger, Faraci Lange, LLP, Rochester, NY, for Petitioner.*

*Mark K. Hellie, U.S. Department of Justice, Washington, DC, for Respondent.*

### RULING ON ENTITLEMENT[1]

On January 27, 2021, Haley Faro filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that as a result of an influenza ("flu") vaccine received on October 24, 2019, she suffered a left shoulder injury related to vaccine administration ("SIRVA"), as defined by the Vaccine Injury Table (the "Table"). Petition at 1 (ECF No. 1). The case was assigned to the Special Processing Unit of the Office of Special Masters.

For the reasons set forth below, I find that Petitioner has established a SIRVA injury according to the QAI requirements, and that she has established by preponderant

---

[1] Because this ruling and decision contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means this Ruling/Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

evidence that she likely suffered the residual effects of this injury for more than six months. Therefore, Petitioner has proven her entitlement to compensation for her SIRVA injury.

## I.    Relevant Procedural History

This claim was initiated five years ago. (ECF No. 1). On June 9, 2022, Respondent filed his Rule 4(c) Report in which he contested entitlement. (ECF No. 20). On November 6, 2023, Petitioner filed a Motion for Ruling on the Record regarding entitlement. (ECF No. 28). Respondent filed his Response brief on February 23, 2024. (ECF No. 23). Petitioner filed a Reply brief on February 28, 2024. (ECF No. 30). The matter is now ripe for disposition.

## II.    Relevant Medical History

### A.  Medical Records

Petitioner's pre-vaccination medical history reveals no evidence of left shoulder pain or dysfunction. On October 24, 2019, Petitioner received a flu vaccine in her left arm at her place of employment. Ex. 2 at 1.

On November 19, 2019, Petitioner met with Cynthia Ericson, BSN, RN, at her employment health clinic, complaining of left arm pain. Ex. 8 at 56. Petitioner reported her pain began after receiving a vaccination on October 24, 2019. *Id.* She had complaints of pain with movement, but no pain when relaxed. *Id.* Nurse Ericson discussed Petitioner's complaint with human resources, and it was deemed "difficult to determine if pain was a direct result of the flu shot as it could be from other issues – employee does work out and lifts weights as well." *Id.* It was recommended Petitioner ice her shoulder and see her primary care provider if the pain continued. *Id.*

On December 2, 2019, Petitioner saw orthopedic physician's assistant (PA) Kimberly Fitch, to establish care and evaluation of left shoulder pain. Ex. 4 at 445. Petitioner reported the pain began "directly" after her October vaccination. *Id.* She described her pain as "significantly aching," with it being worse at night. *Id.* She tried ice, ibuprofen, and icy hot with no relief. *Id.* Physical examination showed no signs of swelling, tender to palpation, no AC joint pain and no long head biceps pain. *Id.* Petitioner had good range of motion and positive impingement signs. *Id.* Negative for Speed's test. *Id.* X-rays were performed and were within normal limits. *Id.* PA Fitch's assessment of Petitioner's left shoulder was tendonitis/bursitis. *Id.* Petitioner was prescribed Meloxicam and physical therapy. *Id.* Petitioner was to follow up in two or three weeks. *Id.*

2

The next day, Petitioner had an x-ray of her left shoulder. Ex. 4 at 434; Ex. 5 at 7. Results were unremarkable and showed no evidence of fracture or dislocation. *Id.* Also on December 3, 2018, Petitioner began physical therapy ("PT"), and she stated at this time that her pain began after her October 2019 vaccination. Ex. 5 at 7. She reported the pain was worse with lifting, abduction, disrupted her sleep but was "improving." *Id.* Physical examination showed passive and active left shoulder motion, no pain to palpation, left shoulder subacromial impingement, and Petitioner scored a 19% disability level. *Id.* With respect to range of motion ("ROM"), the initial evaluation notes that "[p]assive and active L shoulder motion is WFL [within functional limits] and pain-free."[3] *Id.* The treatment plan was physical therapy once a week for up to eight weeks, use a home exercise plan and apply heat an ice. *Id.*

On December 9, 2019, Petitioner had her second PT appointment. Ex. 5 at 6. Petitioner reported to be "feeling better" at this appointment, although she was not performing her home exercises as much as she should. *Id.* At Petitioner's third and final PT appointment on December 17, 2019, Petitioner reported she was doing well but is noted as stating "it still reminds me that it's there occasionally." *Id.* Petitioner was to keep preforming her home exercises and was to follow up if needed *Id.*

On January 7, 2020, Petitioner returned to PA Fitch for orthopedic follow up. Ex. 4 at 464. Petitioner had been taking meloxicam and did physical therapy, and felt "significantly improved" and was now able to sleep on her left shoulder. *Id.* Physical examination showed Petitioner had "great range of motion" and her shoulder was "much less tender" than the prior visit. *Id.* Negative for O'Brien and Speed's tests. *Id.* Petitioner was instructed to discontinue taking Meloxicam, avoid overhead use for a while and follow up on an as needed basis. *Id.*

On January 29, 2020, Petitioner had an appointment with an allergy immunologist for her history of urticaria. Ex. 4 at 480. There was no mention of left shoulder pain at this appointment.

On April 2, 2020, Petitioner went to her Employee Health Office and reported flu-like symptoms. Ex. 8 at 20. On April 7, 2020, Petitioner went to urgent care with continuing flu-like symptoms and reported being in contact with someone who tested positive for Covid. Ex. 4 at 507. Petitioner tested positive for strep at this appointment. *Id.* at 510.

---

[3] As indicated by her treating physical therapist, Scott Pugliese, PT, CSCS, WFL is a term of art in therapy meaning "within functional limits," but nevertheless denotes a patient with reduced ROM, even though not severe enough to prevent functionality for day-to-day tasks. Ex. 11 at 1-2. In contrast, Mr. Pugliese noted that if Petitioner's left shoulder range of motion had been normal, he would have described it as "WNL" meaning "within *normal* limits." *Id.* at 2 (emphasis added).

On April 29, 2020, Petitioner had a telehealth visit with her allergy specialist. Ex. 4 at 543. On April 30, 2020, Petitioner had a phone health visit with a urology physician's assistant. *Id.* at 550. On May 20, 2020, Petitioner had a phone appointment with neurologist Lauryn Hemminger, M.D. Ex. 4 at 587. Petitioner reported her migraines were being managed with Excedrin and she was "otherwise doing ok." *Id.*  There were no reports of left shoulder pain at any of these appointments.

On August 11, 2020, Petitioner completed a health screening questionnaire at her employer. Ex. 8 at 23. Petitioner reported no new health problems or injuries. *Id.* Petitioner reported she does cardio exercise six – seven times a week. *Id.*

A letter from Mala Ashok, M.D., was provided stating Petitioner received a flu vaccine on September 22, 2020. Ex. 8 at 54. There are no details as to which arm the vaccine was administered in.

On October 7, 2020, Petitioner had an unrelated medical appointment. Ex. 4 at 637. There are no reports of left shoulder pain at this visit.

Petitioner returned to PA Fitch for complaints of left shoulder pain on December 22, 2020 – now almost a year since her last shoulder-specific treatment. Ex. 4 at 652. Petitioner reported that her symptoms seemed to "wax and wane," and as an occupational therapist she has access to physical therapy at her place of employment. *Id.* She was feeling better until the prior November when her shoulder became painful. *Id.* Physical examination showed "very good range of motion", "no signs of frozen shoulder: and some "mild" tenderness. *Id.* Petitioner did have some pain with Jobe testing, resisted O'Brien testing and was negative for Hawkins and Speed's tests. *Id.* at 653. PA Fitch assed Petitioner with persistent left shoulder pain post flu induced tendonitis/bursitis. *Id.* Petitioner was referred for an MRI and received a cortisone injection in her shoulder. *Id.*

On January 30, 2021, Petitioner underwent an MRI of her left shoulder. Ex. 10 at 1. MRI results showed "increased signal within the infraspinatus myotendinous junction, compatible with tear………[t]he remaining rotator cuff tendons are intact." *Id.* No joint effusions or substantial bursal collections were noted. *Id.* The supraspinatus, infraspinatus, teres minor, and long head biceps tendons were intact. *Id.*

No further medical records have been filed.

### B. Personal Statements

Petitioner has submitted a signed declaration in support of her claim, filed on February 1, 2021. Ex. 1. In it, Petitioner stated that she received her vaccination on October 24, 2019, and felt "immediate pain" but was not "too concerned until the pain persisted and worsened with movement". *Id.* at 1. As the pain did not subside, she went to her employer's health office, who recommended Petitioner seek treatment from her primary care physician. *Id.* Petitioner continued that she saw PA Fitch at URMC Orthopedics who prescribed Meloxicam and referred her to physical therapy. *Id.* Petitioner described attending three sessions of physical therapy and after a second visit to PA Fitch, was advised to avoid the motions that aggravate her shoulder pain and return on an "as needed" basis. *Id.* Petitioner then described she continued to manage her shoulder pain on her own and had access to PT equipment through her employer and was able to continue therapy on her own. *Id.* at 2. Petitioner continued that her shoulder pain "worsened significantly" in November 2020, and she returned to PA Fitch's office in December 2020 where she received a cortisone injection. *Id.*

On February 28, 2024, Petitioner filed a signed declaration from her physical therapist, Scott Pugliese, PT. Ex. 11. PT Pugliese noted that Petitioner stated her injury stemmed from an October 2019 flu shot and described the pain was "worse with lifting and abduction and was significant enough to disturb her sleep." *Id.* He continued that although he assessed Petitioner's left shoulder as "within functional limits," this designation meant range of motion was not "normal," even if Petitioner was still able to *use* the left shoulder. *Id.*

## III.   Parties' Respective Arguments

Respondent has argued that Petitioner is not entitled to compensation because she has failed to establish by preponderant evidence that she suffered reduced range of motion in her left shoulder along with pain and that she suffered the residual effects of her alleged injury for more than six months. Response at 7-9. Petitioner, on the other hand, argues that the record contains preponderant evidence to establish that she has met the QAI requirements of a Table SIRVA claim and also that she suffered the effects of her SIRVA for more than six months. Motion at 5-6.

## IV.   Applicable Law

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation,

and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence.  The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. "Written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Murphy v. Sec'y of Health & Hum. Servs.*, No. 90-882V, 1991 WL 74931, *4 (Fed. Cl. Spec. Mstr. April 25, 1991), quoted with approval in decision denying review, 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed.Cir.1992)). And the Federal Circuit recently "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).

The United States Court of Federal Claims has outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381, 391 (1998) (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such fact testimony must also be determined. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly

recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id*.

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing Section 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

## Analysis

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). In addition to requirements concerning the vaccination received, the duration and severity of petitioner's injury, and the lack of other award or settlement,[4] a petitioner must establish that he suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination he received. Section 11(c)(1)(C).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of an influenza vaccine. 42 C.F.R. § 100.3(a)(XIV)(B). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

> (i) No history of pain, inflammation, or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

---

[4] In summary, a petitioner must establish that he received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception; suffered the residual effects of his injury for more than six months, died from his injury, or underwent a surgical intervention during an inpatient hospitalization; and has not filed a civil suit or collected an award or settlement for his injury.  *See* § 11(c)(1)(A)(B)(D)(E).

(ii) Pain occurs within the specified time frame;

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g.* NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, the Federal Circuit has recently "reject[ed] as incorrect the presumption that medical records are always accurate and complete as to all of the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021). Medical professionals may not "accurately record everything" that they observe or may "record only a fraction of all that occurs." *Id.*

Medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381 at 391 (1998) (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such testimony must also be determined. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id*.

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184 at 204 (2013) (citing § 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

### A. Table Elements

After a review of the entire record, I find that a preponderance of the evidence supports the conclusion that Petitioner has satisfied the Qualifications and Aids to Interpretation ("QAI") requirements for a Table SIRVA.

### 1. Petitioner has no Prior Left Shoulder Condition or Injury

The first requirement for a Table SIRVA is a lack of problems associated with the affected shoulder prior to vaccination that would explain the symptoms experienced after vaccination. 42 C.F.R. § 100.3(c)(10)(i). Here, there is no evidence that Petitioner suffered from left shoulder pain before her October 2019 vaccination. Respondent has also not made any argument suggesting he believes that Petitioner had a prior left shoulder condition or injury. Accordingly, Petitioner has met the first QAI requirement.

### 2. Pain Occurs with the Specified Timeframe (Onset)

A petitioner alleging a Table SIRVA must show that he experienced the first symptom or onset within 48 hours of vaccination (42 C.F.R. § 100.3(a)(XIV)(B)). Once again, there is no serious contention from Respondent that Petitioner has failed to meet this requirement, nor would the record allow for such a conclusion. The record reflects that Petitioner first complained of left shoulder pain less than one month following vaccination and placed the inciting incident as the flu vaccine. Ex. 8 at 56. Petitioner again

recounted that her shoulder pain began immediately following vaccination at her next appointment on December 2, 2019, as well. Ex. 4 at 445. Accordingly, Petitioner has satisfied the second QAI requirement.

### 3. Petitioner's Pain and Limited Range of Motion was Limited to her Right Shoulder

The specific language of a SIRVA injury contained in the QAI of the Vaccine Injury Table is that "pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered." 42 C.F.R. § 100.3(c)(10)(iii) (QAI criteria)). Respondent has argued that Petitioner has failed to meet this requirement because she has failed to preponderantly establish that she suffered both pain *and* limited range of motion in her left shoulder because although her medical records consistently reflect reported pain, they also consistently reflect that her demonstrated range of motion was normal throughout her injury course.

Petitioner argues that the medical records establish that she suffered minor range of motion issues which were noted during her initial evaluation for PT on December 3, 2019. Specifically, Petitioner highlights a portion where her active and passive left shoulder motion is described by her physical therapist, Mr. Scott Pugliese, as "WFL," meaning within functional limits. Petitioner has also submitted a signed affirmation from Mr. Pugliese in which he states that "WFL" is "a specific term of art in physical therapy that means that while Haley's left shoulder range of motion was not normal, she was still able to use the left shoulder functionally for day to day tasks." Ex. 11 at 1-2. He further states that if Petitioner's "left shoulder range of motion was normal, I would have described it as "WNL", which means "within normal limits" and that although he does not recall the specifics of Petitioner's injury, his "description of it as "WFL" means that it was not normal, but restricted to a degree that did not impair function." *Id.* at 2.

Although this QAI requirement has been interpreted as requiring a petitioner suffer both pain *and* limited range of motion, there is no requirement regarding the degree of severity and duration of any reduced range of motion." *Merwitz v. Sec'y of Health & Hum. Servs.*, No. 20-1141V, 2022 WL 17820768, *3 (Fed. Cl. Spec. Mstr. Nov. 14, 2022). In the instant case, although Petitioner's reduced range of motion appears to have been extremely mild, the combination of her PT records describing her range of motion as "within functional limits" combined with the evidence from her physical therapist indicating that he would not have used this designation had Petitioner not had *some* documentable reduction in left shoulder range of motion, means that Petitioner has carried her burden of establishing that she suffered both pain and reduced range of motion in her left shoulder.

10

Accordingly, Petitioner has satisfied the third QAI requirement for entitlement.

### 4.  There is No Evidence of Another Condition or Abnormality

The last criterion for a Table SIRVA states that there must be no other condition or abnormality which would explain Petitioner's current symptoms. 42 C.F.R. § 100.3(c)(10)(iv). Once again, there is insufficient evidence in the record to suggest an alternative cause of Petitioner's left shoulder issues and Respondent does not argue that there is any evidence of another condition or abnormality. There is no serious contention that Petitioner's initial symptoms were brought on by anything other than her vaccination. Accordingly, I find that Petitioner has satisfied the fourth QAI requirement for entitlement.

### B.  Other Requirements for Entitlement

In addition to establishing a Table injury, a petitioner must also provide preponderant evidence of the additional requirements of Section 11(c). The overall record contains preponderant evidence to fulfill these additional requirements.

The record shows that Petitioner received a flu vaccine intramuscularly on October 24, 2019. Ex. 1; *see* Section 11(c)(1)(A) (requiring receipt of a covered vaccine); Section 11(c)(1)(B)(i)(I) (requiring administration within the United States or its territories). There is no evidence that Petitioner has collected a civil award for her injury. Petition at 4; Section 11(c)(1)(E) (lack of prior civil award).

As stated above, I have found that the onset of Petitioner's right shoulder pain was within 48 hours of vaccination. *See* 42 C.F.R. § 100.3(c)(10)(ii) (setting forth this requirement). This finding also satisfies the requirement that Petitioner's first symptom or manifestation of onset occur within the time frame listed on the Vaccine Injury Table. 42 C.F.R. § 100.3(a)(XIV)(B) (listing a time frame of 48 hours for a Table SIRVA following receipt of the influenza vaccine). I have also found that Petitioner's pain and reduced range of motion was limited to her left shoulder. 42 C.F.R. § 100.3(c)(10). Finally, I find that there was no condition or abnormality that would explain Petitioner's symptoms after vaccination. *Id*. Therefore, Petitioner has satisfied all requirements for a Table SIRVA.

The last criteria which must be satisfied by Petitioner involves the duration of her SIRVA. For compensation to be awarded, the Vaccine Act requires that a petitioner suffer the residual effects of his or her left shoulder injury for more than six months or required surgical intervention. *See* Section 11(c)(1)(D)(i) (statutory six-month requirement). Respondent argues that the records reflect Petitioner's SIRVA was essentially resolved by January 7, 2020, approximately two-and-a-half months post -vaccination, when at an orthopedic follow-up she reported her shoulder was feeling much better than before, that

11

she could sleep on it, and was advised she could stop taking meloxicam for her symptoms. Response at 9. Respondent further notes that between January and her next appointment concerning her shoulder on December 22, 2020, Petitioner had several intervening medical visits at which she noted she was doing well or otherwise did not report left shoulder symptoms. *Id.* Finally, Respondent notes that it is difficult to distinguish Petitioner's ongoing shoulder symptoms related from the alleged SIRVA from other potential causes of shoulder pain, specifically the fact that Petitioner is noted to enjoy exercising and lifting weights most days of the week. *Id.* at 10-11. Respondent argues that because Petitioner admits to rigorous, near-daily exercise during her treatment gap, it cannot be reasonably said that her December 22, 2020, medical appointment and lone tendon tear on MRI preponderantly establishes that she suffered the residual effects of a SIRVA for more than six months. *Id.* at 11-12.

Notwithstanding Respondent's arguments, I find that Petitioner has established by a bare amount of preponderant evidence that her symptoms persisted for more than six months. Of note are the medical records from her appointment on December 22, 2020, which state that she had immediate significant pain after a flu shot in October 2019, and that the symptoms had since seemed to wax and wane. Ex. 4 at 652. The symptoms were severe enough at this appointment that she received a subacromial steroid injection. *Id.* at 653. The assessment of Petitioner's symptoms was "[p]ersistent left shoulder pain status post flu induced tendonitis/bursitis October 2019." *Id.*

Although the gap in treatment from January to December 2020 is not insubstantial, it speaks more towards the overall severity of the injury (and thus the potential pain and suffering damages available to Petitioner) than to whether residual effects of her symptoms persisted for six months after onset. On the balance of the record, it appears that Petitioner had immediate shoulder pain following her vaccination, consistently treated it until January 2020, when her symptoms had abated enough to where she could cease PT and prescription medication, but continued to wax and wane throughout the year until they because too painful to ignore in December 2020, when she again sought treatment and received a steroid injection.

Based upon all of the above, Petitioner has established that she suffered a Table SIRVA. Additionally, she has satisfied all other requirements for compensation. I therefore find that Petitioner is entitled to compensation in this case. However, I note that based on the record, it appears that Petitioner suffered a mild SIRVA injury which did not necessitate a large amount of care to manage (three PT sessions along with prescription anti-inflammatories, followed by a large gap, then one steroid injection). Therefore, I would expect any potential award of pain and suffering damages to be modest and for Petitioner to tailor her demand accordingly.

**Conclusion**

In view of the evidence of record, I find Petitioner is entitled to compensation. A damages order will be entered following the issuance of this ruling to direct the parties of the next steps in resolving damages.

**IT IS SO ORDERED.**

<u>**s/Brian H. Corcoran**</u>
Brian H. Corcoran
Chief Special Master